IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


STEVE R. TABOR,

       Plaintiff,

vs.                                                    CASE NO. 1:11-cv-37-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

       Defendant.

_____/


## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for supplemental security income benefits ("SSI").  (Doc. 1).  The Commissioner has answered (Doc. 9), and both parties have filed briefs outlining their respective positions.  (Docs. 12 and 13.)  For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

On September 19, 2008, Plaintiff filed an application for supplemental security income, alleging a disability onset date of January 1, 1995. (R. 42-43, 88-91.)  Plaintiff's application was denied initially on September 19, 2008 and upon reconsideration on Mach 19, 2009.  (R. 42-43, 46-49, 60-62.)  An Administrative Law Judge ("ALJ") conducted Plaintiff's administrative hearing on July 12, 2010.  (R. 22-41.)  The ALJ issued a decision unfavorable to Plaintiff on August 13, 2010.  (R. 8-21)  Plaintiff's

request for review of the hearing decision by the Appeals Council was denied on May 5,

2011.  (R. 1-5, 331-47.)  Plaintiff then appealed to this Court.  (Doc. 1.)

## II. FINDINGS OF THE ALJ

The ALJ found that Plaintiff had not engaged in substantial gainful activity since

his application date of September 19, 2008.  The ALJ found at Step 2 of the sequential

evaluation that Plaintiff had the following severe impairment: degenerative joint disease

of the hips.  (R. 13.)  The ALJ concluded, however, that Plaintiff's mental impairments

(polysubstance abuse, mild anxiety) were not severe because: (1) the medical evidence

fails to show the presence of severe mental impairments; (2) Plaintiff has never been

hospitalized or referred to a specialist for treatment of mental impairments; (3) Plaintiff

has been sober for several years; and (4) Plaintiff's mental impairments impose mild or

no functional limitations and no there is no evidence of episodes of decompensation.

(R. 14-15.)  The ALJ found that Plaintiff's severe impairments or combination of

impairments did not meet or medically equal the Commissioner's Listings because the

medical evidence did not support listing-level severity and no acceptable medical

source mentioned findings equivalent in severity to the criteria of any listed impairment.

(R. 15.)  The ALJ concluded that Plaintiff had the residual functional capacity to perform

a wide range of sedentary work.  (R. 15-16.)  The ALJ concluded that Plaintiff was not

capable of performing any of his past relevant work as a carpenter, salesman, or

maintenance supervisor.  (R. 19.)  However, the ALJ did conclude, after hearing

testimony from a vocational expert ("VE"), that jobs exist in significant numbers in the

national economy that Plaintiff can perform, such as: almond blancher, plastic design

applier, and sticker.  Accordingly, the ALJ concluded that Plaintiff had not been under a

disability since the application filing date of September 19, 2008.  (R. 20.)

## III. ISSUES PRESENTED

The issues presented by Plaintiff are whether the ALJ (1) erred by failing to

develop the record by not ordering IQ testing of the Plaintiff, and (2) erred in finding that

Plaintiff's mental impairments were non-severe.  Plaintiff argues that as a result of

these errors, the ALJ's failure to find that Plaintiff met or equaled Listing 12.05C (mental

retardation), assessment of Plaintiff's residual functional capacity ("RFC"), and finding

that significant numbers of jobs exist in the national economy which Plaintiff can

perform are not supported by substantial evidence.  (Doc. 12.)

## IV. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more

than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

---

[1] See 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[9]  Second, if a

---

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[11]  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[12]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15]  The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive

––––––––––––––––

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## V.  SUMMARY OF THE RECORD

### A.    Personal Background

---

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] *See id.*

Plaintiff was 48 years old at the time of the administrative hearing.  He completed ninth grade.  (R. 26.)  He has worked as a carpenter, maintenance supervisor, and salesman.  (R. 27, 96.)  He alleges disability due to bone deterioration and problems with dislocation in his hips.  (R. 98.)

### B.  Mental Impairments

Plaintiff completed a supplemental pain questionnaire on October 21, 2008.  He described daily pain relieved about 50% by medications.  Plaintiff reported no side effects from the darvocet and ibuprofen.  Plaintiff said his mother cooked, cleaned, and did his laundry and that he attended to his personal care needs although he needed help washing and drying his feet and putting on socks.  Plaintiff wrote that his mother helped him complete the questionnaire because of his dyslexia.  (R. 113-115.)

Plaintiff completed an adult function report on October 26, 2008.  He reported that his daily activities including getting up, having breakfast, lying down because of pain, walking in the yard a little, sitting or lying down again because of pain, sometimes helping with laundry, sometimes having friends visit, bathing, and going to bed.  He cares for dogs.  Plaintiff reported needing help putting shoes and socks, washing and drying his lower legs and feet, and putting medicine on his back.  He prepared his own meals daily and sometimes helped with laundry and changing bed sheets.  Plaintiff advised that he goes outside every day, shops for food, visits friends, and is able to manage his finances when he has money.  Plaintiff reported that he used to fish and hunt but now watches television and visits with friends.  He does not need to be reminded to go places and does not have problems getting along with others.  When

asked what abilities were affected by his conditions, Plaintiff only noted physical

abilities.  He said he can walk 100 feet without needing to stop and rest for 5-10

minutes.  Plaintiff stated that he can pay attention for as long as he wants to and

finishes what he starts, but he has difficulty reading and writing due to dyslexia.  Plaintiff

indicated that he is good at following spoken instructions and getting along with

authority figures, but he does not handle stress or changes in routine well.  (R. 117-

125.)

Diana M. Benton, Psy.D., clinical psychologist, conducted a psychological

evaluation of Plaintiff on December 11, 2008.  Plaintiff interacted appropriately,

provided his history, and was fully cooperative with the evaluation.  Plaintiff's chief

complaint was "24/7" hip pain made tolerable with medications.  Plaintiff reported taking

Klonopin for restless legs and no hospitalizations for mental disorders.  Plaintiff

reported that he completed ninth grade and repeated second, fourth, and seventh

grades.  He stated he had dsylexia.  Plaintiff reported four DUI arrests and one

conviction, but denied drinking anything for the past six months.  Plaintiff explained that

no one will hire him with two artificial hips and that he is not to squat, kneel, crawl, climb

ladders, walk up stairs, or lit over 20 pounds.  Plaintiff related that he visits with friends

about every other day and sometimes rides in the woods with friends.

Mental status examination revealed that Plaintiff was well-groomed, had good

eye contact, and spoke spontaneously with a normal rate and tone.  There was no

evidence of expressive or receptive difficulties with speech, and Plaintiff was able to

engage appropriately in conversation.  Thought processes were logical and goal-

oriented, and there was no evidence of delusions or abnormal thought content. There was no evidence of perceptual abnormalities. Plaintiff had a euthymic mood with congruent affect and denied suicidal or homicidal ideation, intent, and plan. Plaintiff was well oriented to time, place, and time. His memory was characterized by the repetition of four digits forward and three backward. He was able to spell "world" backwards. Plaintiff's recent memory was characterized by recall of 3 of 3 objects. His remote memory appeared to be intact, and information was adequate. He was able to perform serial sevens subtraction (4 of 5 correct) and mental addition of double digit numbers and simple multiplication. Plaintiff's abstract thinking was intact, and judgment and insight were grossly normal.

Dr. Benet's diagnosis was alcohol abuse, in full remission. She noted that Plaintiff would be able to manage his funds if benefits were awarded. (R. 231-236.)

Gary Buffone, Ph.D., completed a psychiatric review technique on December 19, 2008. Dr. Buffone opined that Plaintiff did not have severe mental impairments; he had alcohol abuse disorder in full remission. He found no functional limitations in maintaining social functioning; mild limitations in activities of daily living and maintaining concentration, persistence, or pace; and no episodes of decompensation. Dr. Buffone noted that limitations, if present, were "primarily physical." (R. 237-250.)

Dr. Angeles Alvarez-Mullin, M.D., completed a psychiatric review technique on March 13, 2009, and found the same functional limitations as Dr. Buffone. Dr. Alvarez-Mullin was also of the opinion that Plaintiff did not have severe mental impairments. Neither doctor indicated any mental retardation. (R. 251-264.)

**C.**    **Hearing Testimony**

Plaintiff was 48 years old at the time of the administrative hearing on July 12,

2010.  He testified that he was able to do "very little" basic reading and writing.  (R. 26.)

Plaintiff last worked in 1999 supervising a maintenance crew.  He has been living with

his mother for the past 5-6 years.  Plaintiff testified that he has not drank alcohol in two

years, smoked marijuana in 2-3 years, and has not used cocaine since 1985.  Plaintiff

testified that he did not go to any type of rehab.  (R. 27.)  Plaintiff testified that he lives

with his mother and she does the yard work; he does not help with anything inside the

home.  He testified that he spends his days mostly lying in bed and receives pain

medicine and muscle relaxers, though if he could afford it he would be able to see an

orthopedist for his hips.  Plaintiff testified that in additional to his hips, his lower back

bothers him "all the time."  (R. 28.)   Plaintiff said that his only other health problems

were allergies.

Plaintiff testified that his left hip has dislocated approximately 16 times.  The last

time occurred in September 2009.  He went to the emergency room and it took six

hours to get his hip back in place.  (R. 29.)  Plaintiff testified that he has daily pain in

both hips and his lower back.  He takes oxycodone 15, three times per day, although it

does not completely get rid of the pain.  Plaintiff testified that he lays down 5-6 hours in

an 8 hour period because of his pain.  (R. 30.)  His hips can dislocate even just while

sitting in a chair.  Doctors have advised him of several things to avoid, such as ladders,

stairs, squatting, and crawling.  (R. 31.)  Plaintiff testified that he can ride in a vehicle

15-20 minutes at most; he can stand comfortably for only 15 minutes; he can walk

comfortably about 100 feet.  (R. 32.)  Plaintiff testified that his pain medications affect his energy, memory, and concentration, and that his pain interferes with his sleep.  (R. 33.)

VE Jane Bucca also testified at the hearing.  The VE testified that an individual with limitations of lifting ten pounds occasionally, standing and walking two hours in an eight-hour day, and avoiding ladders, ropes, scaffold, occasionally climbing ramps or stairs, balance, stoop, kneel, crouch, no crawling could not perform Plaintiff's past relevant work as a carpenter, maintenance supervisor, or salesman.  (R. 36-37.)  The VE testified that jobs existed for someone with the same limitations and Plaintiff's age, education, and background. Specifically, the VE suggested almond blancher, plastic design applier, and sticker.  (R. 37.)  The VE testified that if the hypothetical person needed to alternate sitting and standing during the course of the day, he could still perform the jobs as long as standing and walking lasted no more than 3-4 minutes. The VE testified that the hypothetical individual could not perform any of the jobs if he had to lie down during the course of the day.  (R. 38.)

Plaintiff's attorney offered closing remarks, emphasizing Plaintiff's hip dislocations, pain, and need to lie down during the day.  (R. 39-40.)

## VI.  DISCUSSION

The issues presented by Plaintiff are whether the ALJ (1) failed to develop the record by not ordering IQ testing of the Plaintiff, and (2) erred in finding that Plaintiff's mental impairments were non-severe.  Plaintiff argues that as a result of these errors, the ALJ's failure to find that Plaintiff met or equaled Listing 12.05C (mental retardation),

assessment of Plaintiff's residual functional capacity ("RFC"), and finding that significant numbers of jobs exist in the national economy which Plaintiff can perform are not supported by substantial evidence.  (Doc. 12.)

**IQ Testing and Listing 12.05C**

Plaintiff argues that the ALJ failed to fully and fairly develop the record by refusing to order a further consultative examination and IQ test of Plaintiff, the failure of which impacted Plaintiff's ability to meet the requirements of Listing 12.05C.

There is no question "[t]hat the ALJ has a basic duty to develop a full and fair record."[21]  As a Social Security administrative hearing is non-adversarial in nature,[22] the duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[23]  An ALJ, however, "is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision."[24]  In the end, however, "the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim."[25]

---

[21]  Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003);  20 C.F.R. § 416.912(d) ("Before we make a determination that you are disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application . . . .").

[22]  Id.

[23]  See Mason v. Barnhart, 63 Fed. Appx. 284, 287 (9th Cir. 2003).

[24]  Ingram v. Comm'r Social Secur. Admin., 496 F.3d 1253, 1269 (11th Cir. 2007); see also Outlaw v. Barnhart, 197 Fed. Appx. 825, 828 (11th Cir. 2006)(per curiam)(noting that "the ALJ may order a physical or mental examination of a claimant at the government's expense; but the ALJ is not required to order an examination if it is not necessary to enable the ALJ to make a disability determination.").

[25]  Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003).

Plaintiff presented no evidence to suggest that a diagnosis of mental retardation might be appropriate.  Nor did Plaintiff allege in his application for disability benefits or during his hearing testimony that mental retardation was a possible impairment. Plaintiff's counsel, in delivering closing remarks at the administrative hearing, alleged disability based on Plaintiff's hip problems and pain, and did not allege mental impairments, including mental retardation.  (R. 39-40.)  The ALJ does not have a duty to develop the record regarding an impairment that Plaintiff did not present in his application or at the hearing.  *See Robinson v. Astrue*, 365 Fed. Appx. 993, 995 (11th Cir. 2010) (unpublished) (citing *Pena v. Chater,* 76 F.2d 906, 909 (8th Cir. 1996)).

Even assuming, however, that the ALJ should have ordered an IQ test, it would not have made any difference with regard to meeting Listing 12.05C because there was no evidence that Plaintiff met the requirements of the Listing.  Unlike other mental disorders, the listing for mental retardation in Listing 12.05C requires that the claimant's impairment "satisf[y] the diagnostic description in the introductory paragraph" *and* any one of the four sets of criteria that follow it.[26]  In determining whether a claimant has "[met] a listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings. . . ."[27]  Pursuant to 20 C.F.R. 404.1525(c), the introductory portion of each

------

[26]  20 C.F.R. Part 404, App. 1, Subpart P, 12.00A, ¶ 4.  Where adults have not had intelligence testing prior to age 18, a diagnosis of mental retardation satisfying the diagnostic requirement of this Listing could be inferred from the plaintiff's history and current functioning.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,753 (Aug. 21, 2000) (to be codified at 20 CFR Parts 404 and 416).

[27]  Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002).

Listing defines or explains key specific medical findings which may be required to establish a diagnosis or confirm the existence of the impairment in order to meet the Listing.

Under Listing 12.05, an individual is mentally retarded if they have a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."[28]   The definition of mental retardation in the DSM-IV parallels the definition in the Listing.[29]   General intellectual functioning refers to an IQ of about 70 or below on various standardized intelligence tests.[30]

In addition to the diagnosis of mental retardation, Listing 12.05C requires that the claimant must have "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function."[31]   As such, IQ alone is not enough to determine mental retardation, as "[i]mpairments in adaptive functioning, rather than low IQ, are usually the

---

[28]  Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997) (finding that at the very least, to be considered for disability benefits under Listing 12.05, the claimant must meet all parts of the diagnostic definition in the introductory paragraph: "(1) significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." Once these three elements have been established, the court looks to paragraphs A ,B, C, and D to assess the severity of Plaintiff's mental retardation and its impairment on plaintiff's ability to work.

[29]  "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." DSM-IV at 40.

[30] DSM-IV at 42.

[31]  20 C.F.R. Part 404, App. 1, Subpart P, 12.05(c).

presenting symptoms in individuals with Mental Retardation."[32]  While the IQ often

remains stable, adaptive function can improve with training,[33] and therefore a valid IQ

score is not enough to determine if someone is mentally retarded.[34]

For example, "mental retardation would not be diagnosed in an individual with an

IQ lower than 70 if there are no significant deficits or impairments in adaptive

functioning."[35]  Thus, in addition to a qualifying I.Q. score Plaintiff must also

demonstrate that he possessed "a physical or other mental impairment imposing an

additional and significant work-related limitation of function."[36]

Plaintiff presented no evidence suggesting a sufficiently low IQ score or deficits

in adaptive functioning prior to the age of 22.  Not only does the record not reflect any

diagnosis of mental retardation, it does not even suggest a diagnosis of below-average

intelligence.  To the contrary, substantial evidence supports the ALJ's decision to

decline to find that Plaintiff met the requirements of Listing 12.05C.  Two state agency

psychologists found no evidence of mental retardation or any severe mental

---

[32] DSM-IV at 42.

[33] Id.

[34] "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there
are no significant deficits or impairments in adaptive functioning."  See Lowery v. Sullivan, 979 F.2d 835,
837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score
is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.") (citing
Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)).

[35] See Lowery v. Sullivan, 979 F.2d 835, 837(11th Cir. 1992) ("[A] valid IQ score need not be
conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record
on the claimant's daily activities and behavior.")(citing Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir.
1986)).

[36] 20 C.F.R. Part 404, App. 1, Subpart P, 12.05(c).

impairments.  (R. 237-250, 251-264.)  Plaintiff previously performed skilled work at SVP

levels 5 and 7, as a maintenance supervisor, salesman, and carpenter prior to his

alleged onset date.  (R. 36.)  Furthermore, a December 2008 mental status examination

revealed that he was well-groomed; had good eye contact; spoke spontaneously with a

normal rate and tone; engaged appropriately in conversation; had logical and goal-

oriented thought processes; had a euthymic mood with congruent affect; denied

suicidal or homicidal ideation; and was well oriented to time, place, and time.  There

was no evidence of expressive or receptive difficulties with speech, delusions, abnormal

thought content, or perceptual abnormalities.  His memory was characterized by the

repetition of four digits forward and three backward.  He was able to spell "world"

backwards.  Plaintiff's recent memory was characterized by recall of 3 of 3 objects.  His

remote memory appeared to be intact, and information was adequate.  He was able to

perform serial sevens subtraction (4 of 5 correct) and mental addition of double digit

numbers and simple multiplication.  Plaintiff's abstract thinking was intact, and judgment

and insight were grossly normal.  (R. 231-236.).

The evidence also indicates that Plaintiff carried out many daily living activities,

such as preparing food, shopping, caring for himself, caring for pets, shopping, and

laundry.  Plaintiff also reported going outside, watching television, and sometimes riding

in the woods with friends.  He reported no problems in getting along with others, and

the restrictions reported by Plaintiff in his function report were generally related to

physical pain rather than mental impairments.  Plaintiff did not need to be reminded to

do things, could pay attention for has long as he wants, finished what he started, and

could manage his finances. (R. 113-116, 117-125.)  Furthermore, Dr. Benet opined that

if he was awarded benefits, Plaintiff would be able to manage his finances.  (R. 236.)

In short, Plaintiff did not present any evidence suggesting he had adaptive

functioning difficulties nor does the record reflect Plaintiff, even if additional IQ testing

would have been ordered, would have met the requirements of Listing 12.05C.

## Severity of Mental Impairments

Plaintiff argues that the ALJ erred at Step 2 of the sequential evaluation by not

finding that Plaintiff's mental impairments were severe.  At Step 2 in the sequential

evaluation, the ALJ found that Plaintiff's degenerative joint disease was a severe

impairment but that Plaintiff's mental impairments of polysubstance abuse disorder and

anxiety were not severe.  (R. 13-14.)   The ALJ's conclusion that Plaintiff's mental

impairments were not severe is supported by the substantial evidence of record.

An impairment or combination of impairments is severe at Step 2 of the

sequential evaluation if it significantly limits one's physical or mental ability to do basic

work activities.[37]  To be considered "severe"  a medical condition must constitute more

than a "deviation from purely medical standards of bodily perfection or normality."[38]

Thus, a diagnosis of "depression" does not necessarily compel the conclusion that the

condition is disabling.[39]  Although the threshold for meeting the definition of a "severe

---

[37] 20 C.F.R. § 404.1520(c).

[38] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

[39] 20 C.F.R. §§ 404.1520(c), 416.920(c); see also Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[t]here must be a showing of related functional loss" for a psychological disorder to be considered disabling).

impairment" at Step 2 is low, the burden is, nonetheless, on the Plaintiff to provide evidence demonstrating the disabling impact of the mental impairments.[40]  The ALJ is required to evaluate Plaintiff's mental impairments in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.[41]  If the degree of limitation in the first three functional areas is rated as "none" or "mild" and "none" in the fourth area, the ALJ generally concludes the mental impairment is not severe.[42]

The ALJ concluded that based on the totality of the evidence, Plaintiff had mild limitations in activities of daily living; no limitations in social functioning; and mild limitations in concentration, persistence, or pace.  The ALJ found no episodes of decompensation.  (R. 14-15.)  Substantial evidence supports the ALJ's finding that Plaintiff's mental impairments are not severe.

The record does not reflect that Plaintiff has ever received special treatment for mental health issues, has ever been hospitalized for mental disorders, and other than references to a previous valium prescription, no evidence of treatment with psychotropic drugs.  During Plaintiff's December 11, 2008 evaluation, Dr. Benet found that Plaintiff: was well-groomed; had good eye contact; spoke spontaneously with a normal rate and tone; engaged appropriately in conversation; had logical and goal-oriented thought

---

[40] Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[41] 20 C.F.R. § 404.1520a(c)(3).

[42] 20 C.F.R. § 404.1520a(d)(1). *See also* Cuthbert v. Astrue, 303 F. App'x 697, 699 (11th Cir. 2008) (per curiam).

processes; had a euthymic mood with congruent affect; denied suicidal or homicidal ideation; and was well oriented to time, place, and time.  There was no evidence of expressive or receptive difficulties with speech, delusions, abnormal thought content, or perceptual abnormalities.  His memory was characterized by the repetition of four digits forward and three backward.  He was able to spell "world" backwards.  Plaintiff's recent memory was characterized by recall of 3 of 3 objects.  His remote memory appeared to be intact, and information was adequate.  He was able to perform serial sevens subtraction (4 of 5 correct) and mental addition of double digit numbers and simple multiplication.  Plaintiff's abstract thinking was intact, and judgment and insight were grossly normal.  (R. 231-236.)

The ALJ's conclusion that Plaintiff had no limitations in social functioning and only mild restrictions in activities of daily living and maintaining concentration, persistence, and pace, with no episodes of decompensation, is supported by the findings of state agency psychological experts.  Dr. Buffone and Dr. Alvarez-Mullin each opined that Plaintiff's mental impairments were not severe and that Plaintiff had no limitations in social functioning; mild restrictions in activities of daily living and maintaining concentration, persistence, and pace; and no episodes of decompensation. (R. 237-250, 251-264.)  Dr. Buffone noted that limitations, if present, were "primarily physical."  (R. 237-250.)

The evidence also discloses that Plaintiff carried out many daily living activities, such as preparing food, shopping, caring for himself, caring for pets, shopping, and laundry.  Plaintiff also reported going outside, watching television, and sometimes riding

in the woods with friends.  He reported no problems in getting along with others, and the restrictions reported by Plaintiff in his function report were generally related to physical pain rather than mental impairments.  Plaintiff did not need to be reminded to do things, could pay attention for has long as he wants, finished what he started, and could manage his finances.  (R. 113-116, 117-125.)  And despite his dyslexia, Plaintiff was able to perform skilled work as a maintenance supervisor, salesman, and carpenter.  (R. 19, 36.)

The Court, therefore, concludes that the ALJ did not err in his determination that Plaintiff's mental impairments were not severe at Step 2 and that the ALJ's finding was supported by substantial evidence.  As substantial evidence supports the ALJ's conclusions that Plaintiff's mental impairments are non-severe and Plaintiff does not meet or equal Listing 12.05C (mental retardation), it is unnecessary to address Plaintiff's arguments that the ALJ erred by not determining Plaintiff's mental RFC at Step 4 and not including mental limitations in the hypothetical to the VE.

## VII.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida this 22nd day of February 2012.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 14 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**